Donahue, J.,
concurring in the judgment but dissenting from the reasons given therefor in the majority opinion.
The fact that I dissent from the reasons given by the majority of the court for the judgment *107 entered in this case and yet concur in that judgment, requires that I should give in this separate opinion my reasons for such concurrence.
It is true that the' two propositions covered in the majority opinion are the only important questions in this case and the only ones that were argued by counsel. Yet, notwithstanding I dissent from the conclusion reached by the majority upon these questions, in order to be consistent with the conclusion I have reached in respect thereto, I am compelled to concur in the judgment refusing the writ.
The first question arising upon the pleadings and record in this case is whether municipalities now have authority to exercise all powers of local self-government, without adopting a charter, or without further legislation upon that subject. It would seem that the language employed in Section 3 of Article XVIII of the amendment to the constitution, is so plain that it does not require any construction other than to give to that language its usual and ordinary meaning.
This court, in the case of Slingluff v. Weaver, 66 Ohio St., 621, held that in the construction of á statute, “the intent of the law-makers is to be sought first of all in the language employed, and if the words be free from ambiguity and doubt, and express plainly, clearly and distinctly, the sense of the lawmaking body, there is no occasion to resort to other means of interpretation.”
That rule of construction applies equally to the construction of the constitution, or any paragraph thereof, or to the construction of any contract, or *108 other writing, involving judicial inquiry, and applying that rule to the construction of Section 3 of Article XVIII, it would appear to be the end of controversy.
That part of Section 3 with which we are particularly concerned reads as follows: “Municipalities shall have authority to exercise all powers of local self-government.” Certainly there is nothing obscure or uncertain in this language. It is so plain, concise and unambiguous that it affords no ground for controversy and suggests no doubt as to its meaning.
It is now insisted' on behalf of the respondent, that there must be read into this plain provision of the constitution words imposing conditions precedent to the exercise of this power; that is to say, it must be construed the same as if it read that “Municipalities shall have authority to exercise all powers of local self-government whenever the legislature shall pass the general or additional laws provided for in Section 2 of Article XVIII, or whenever the municipality shall adopt a charter in conformity to the provisions of Section j of that article
For aught I know to the contrary, that might have been a very wise provision to have written in the constitution. But, wise or unwise, it is not there. If it were a mistake not to so write this amendment, correction must be made in some other way than by a construction that will do violence to the language actually found therein.
It probably must be conceded that this language standing alone is not subject to any such construe-* *109 tion as contended for by counsel for respondent. If it is to receive such a construction, it must be because other sections found in Article XVIII so modify the language of Section 3 as to require that construction. Therefore it becomes necessary to consider the further provisions of Article XVIII to determine that question.
The remaining part of Section 3 reads as follows: “And to adopt and enforce within their limits such local police, sanitary and other similar regulations, as are not in conflict with general laws.” Evidently this does not affect in any way •the time when the previous provisions of this section shall go into operation.
Section 1 applies only to the classification of cities and villages. It does not in any sense affect the provisions found in Section 3. But it is important to note that this section, like Section 3, is a clear and positive declaration of a status that is not dependent upon any condition precedent before going into effect.
Section 2 provides that “General laws shall be passed to provide for the incorporation and government of cities and villages; and additional laws may also be passed for the government of municipalities adopting the same.” This section is another grant of power absolutely effective on the day this amendment went into effect, and it is not important whether the legislature avails itself of the authority to pass these laws; it is nevertheless the constitution of the state and in full force and operation.
This section certainly contemplates the existence of general laws in effect at the time this amend *110 ment was adopted, and these general laws in relation to municipalities, that are not in conflict with other provisions of this amendment, are now the general laws of the state in relation to municipal corporations, and will continue as such, in full force until repealed or amended.
It is not necessary to have recourse to the doctrine announced in the case of Cass v. Dillon, 2 Ohio St., 607, as to the effect of the adoption of the constitutional amendments on existing' laws, for the reason that the general schedule attached to these amendments provides, among other things, that “all laws then in force not inconsistent therewith shall continue in force until amended or repealed.”
As said by this court in Cass v. Dillon, supra, “the new constitution of Ohio created no new state. It only altered, in some respects, the fundamental law of the state already in existence.” So that it follows, particularly in view of the schedule specifically providing that all laws in force not inconsistent with the amendments shall continue in force until amended or repealed, that the people of this state, in adopting these amendments to our constitution, must have contemplated and intended that these general laws relating to municipal corporations, not inconsistent with the provisions contained1 in the constitutional amendments, should remain as the “general laws” provided for in Section 2, subject, however, to amendment, repeal and further legislation. So that, if it be contended that these general laws provided for in Section 2 must be passed by the general assembly of this state before the provisions of Section 3 shall go into effect, *111 then the answer to that contention is that these general laws are already on our statute books, and therefore the full measure of that demand is met and satisfied. The folly of delaying the operation of Section 3 for further legislation is so apparent that it would seem that the people of Ohio could not have intended to predicate this substantial grant of power upon the mere possibility of legislative action. The present general laws may never be repealed or amended. No further general laws may ever be enacted. But whether they are repealed, amended or others enacted, that fact cannot change the constitution of the state or affect its operation..
Section 2 of Article XVIII further provides that additional laws may be passed for the government of municipalities adopting the same, and it has been suggested that when these laws are passed and adopted then the grant of power found in Section 3 may become effective. This is in line with the former proposition as to general laws, and I do not care to discuss it further, except to say that if either this or the former construction is to obtain, then the municipalities are still dependent upon the general assembly of the state to measure out to them their power and authority to control their own local affairs, and Section 3 of Article XVIII might just as well never have been written. Undoubtedly it was the intention of this article to change the existing condition of affairs and grant to municipalities directly the authority to exercise all powers of local self-government.
It would be unprofitable to discuss the fact that cities and towns existed and exercised powers of *112 local self-government before the state was created. The fact remains that at the time of the adoption of this amendment municipalities were recognized as creatures of the state, possessing only such powers as the general assembly of the state chose to confer upon them; and it has been uniformly held, in Ohio at least, that municipalities had no power beyond the express powers granted to them by statute. It was this condition of affairs that this provision of the constitution intended to change, and this, I think, these amendments have accomplished. It would therefore follow that the provision of Section 2, authorizing the enactment of general laws for the government of cities and villages, and additional laws for the government of municipalities adopting the same, does not authorize the legislature to grant any powers to municipalities, or to expand the powers already granted by the people, or to fix any date or any condition precedent to the exercise' of these powers. The grant of powers found in Section 3 is full, absolute and complete within itself. Therein is granted authority to exercise all powers of local self-government. Nothing further remains to be granted, and no authority is lodged anywhere, except in the donors of the grant, to impose conditions or delay the exercise of the rights conferred.
It is not suggested that any other section of this article, except Section 7, is in any wise related to Section 3, or in any way modifies the grant of power contained in that section. Yet, looking to all those other sections, we find that they are all declaratory of the rights of municipalities and are not dependent in any sense upon legislative action, *113 except that Section 13 authorizes the passage of laws that limit the power of municipalities to levy taxes and incur debts for local purposes. So it would seem that if these other sections are independent of legislative action, Section 3 also is independent thereof.
Section 7 provides that any municipality may frame and adopt or amend a charter for its government and may, subject to the provisions of Section 3 of this article, exercise thereunder all powers of local self-government. This section does not purport upon its face to control the operation of Section 3. On the contrary, it does purport upon its face that this must be done subject to the provisions of Section 3. In other words, it clearly appears from the language used in Section 7, that Section 3 is the dominant section. Even if this did not appear, there is no language used in Section 7 that even suggests the necessity of a charter before the exercise of the powers conferred in Section 3. If the construction contended for by the .respondent is to be given to this section, then it is necessary to read into it a mandatory provision that this charter must be adopted before municipalities can exercise the powers, of local self-government. That is to say, such a construction would require us to read this section as if it were written in the following language: “Before any municipality may exercise the powers of local self-government, it must frame and adopt or amend a charter for its government.” Suppose this section actually read in these words, would any contention be made here, or in any other forum, that without adopting a charter a city might nevertheless exercise these *114 powers? And yet the construction asked would do as much violence to the language actually used as the other construction would do to the language suggested.
The language used in this section is just as plain and unambiguous as the language used in Section 3. It does not purport to create any conditions, but rather to grant a further privilege to municipalities to frame and adopt or, having so framed and adopted, amend a charter for its government, and then grants the authority to exercise under this charter all powers of local self-government; but particularly provides that this is all subject to the provisions of Section 3.
The impossibility of a construction of these amendments that would delay the exercise of these powers until a charter is adopted becomes apparent when we consider the condition of affairs that would obtain in this state under such a construction. Some municipalities would adopt charters and some would not. Those municipalities adopting charters would then derive their powers of local self-government from the constitution itself, while those municipalities not adopting a charter would still be dependent upon the general assembly of Ohio for authority to control their local municipal affairs. To determine the power and authority of cities not adopting a charter, we must look to the statutes of the state. For the power and authority of those adopting charters, we must look to the constitution itself. I cannot believe that such was the intention either of the framers of this amendement to the constitution or of the •voters who adopted it. Undoubtedly it was in *115 tended that on and after the time fixed in the schedule for these amendments to go into effect, all municipalities of the state should' starid alike and alike receive their powers directly from the same source; and not that part should receive their powers from the general assembly and part from the constitution itself.
Again, the schedule attached to Article XVIII reads as follows: “If the foregoing amendment to the constitution be adopted by the electors and become a part of the constitution, it shall take effect on November 15th, 1912.” It would seem as if this positive provision of the schedule sufficiently evidences the intention of thé people of this state •when they wrote this amendment into their constitution. True, it may be said' that that means only that on and after November 15, 1912, action might be taken to make all the provisions of Article XVIII operative. But when we look to the several sections of Article XVIII, we find that each and all of them are of such nature that they either declare a status or grant authority to do a particular thing. Certainly it cannot be successfully contendéd that where any provision of a constitution grants the authority to do a particular thing the doing or not doing of that particular thing affects in any manner the authority so granted. In other words, some of these sections authorize the general assembly to pass certain laws. That authority is complete on the day the amendment went into effect and any time thereafter the general assembly may exercise that authority. Other sections of this, article provide that the municipalities may acquire, construct, own, lease and operate public utilities, *116 and raise money for such purposes by issuing .mortgage bonds for the ■ purchase, extension or ■equipment thereof; and that any municipality may ■frame and adopt or amend a charter for its government. These things they could do immediately on and after the 15th of November. In fact the only thing that it is contended could not be done immediately on and after the 15th of November, 1912, is that municipalities could not and cannot exercise the powers of local self-government in pursuance of the grant contained in Section 3. The language of this section is just as plain and certain as the language of the other sections. The power is conferred absolutely and without condition, and I can ■see no reason whatever for selecting out this particular section of Article XVIII and saying that this shall not go into effect until certain other .things are accomplished, but that all other sections in this article must be given immediate operation.
For these reasons I cannot concur in the first paragraph of the syllabus written by the majority of this court.
While this first paragraph of the syllabus practically disposes of the case before us and compels a refusal of the writ, yet undoubtedly the second paragraph of the syllabus deals with a proposition equally if not more important than the question covered by the first, and it is unfortunate indeed, that this question could not be settled authoritatively at this time. In view of the fact that I am of the opinion that Section 3 of Article XVIII of the Constitution grants full authority to municipalities to exercise all powers of local self-government without the aid of any legislation and without the *117 necessity of adopting a charter as a condition precedent thereto, I would not consider it necessary to look to the statutes of the state to determine the powers and authority of municipalities, were it not for the holding of a majority of this court that Section 3 of Article XVIII has not yet become effective in the city of Toledo. If that is the correct view of this case, then, perhaps, it must be conceded that there is no' statute now authorizing municipalities to purchase and operate a municipal moving-picture theater; but following the conclusion I have reached, that these statutes purporting to grant powers to municipalities are inconsistent with the amendment to the constitution and entirely superseded thereby, the question is not whether there is any statute conferring such powers upon municipalities, but rather whether the operation of a moving-picture theater comes within the powers of local self-government. This question perhaps involves much more doubt than the former and presents far greater difficulties in arriving at a satisfactory conclusion.
I do not believe that governmental purposes include only the protection of life, liberty and property. On the contrary, I aril firmly of the opinion that one of the most important duties of the state is to promote the health, convenience, comfort and welfare of its citizens and advance the standard of citizenship in every legitimate way. But I do not believe it is within the purview of municipal government to invade the sphere of purely private enterprise wholly disconnected and divorced from public needs or public purposes. It is difficult, perhaps almost impossible, to prescribe a limit *118 where governmental functions end and. private enterprise begins. In the last quarter of a century our views on this subject have so changed that a limit fixed along the line of the prevailing opinion on that subject at that time would seem absurd now, and so it may be a quarter of a century hence.
As an index to what has been generally understood to be comprehended in the term “governmental powers,” it is interesting to note that the general assembly of the state has heretofore conferred upon municipalities by statute the power to own and operate municipal lighting, power and heating plants; to provide for water supply, public grounds, parks and recreation centers; to hold property for charitable purposes; to establish municipal lodging houses, public baths and bath houses; to prevent the sale and distribution of vicious literature; to provide public libraries and reading rooms, to purchase books, papers, maps and manuscripts therefor, and to receive gifts and bequests of money for that purpose; and to maintain and .regulate public band concerts. In addition to this, authority has been granted to municipalities to construct railroads, 66 O. L., 80; 67 O. L., 11; 77 O. L., 91; 79 O. L., 82; 76 O. L., 149; 76 O. L., 180; 89 O. L., 323; 88 O. L., 737; 87 O. L., 110; 89 O. L., 308; 94 O. L., 648 ; 88 O. L., 593;'66 O. L., 83; also to fill and improve lands for terminal facilities, 82 O. L., 143; to empower municipalities to erect machine shops and issue bonds to pay for them, 88 O. L., 8; 77 O. Li, 155; 88 O. Li, 5; 77 Oi L., 292; 88 O. L., 199; 78 O. L., 103; 78 O. L., 39; 89 O. L., 28; 87 O. L., *119 108; 78 O. L., 51; 77 O. L., 7; 78 O. L., 146; 78 O. L., 60; 77 O. L., 193; also to construct glass works, 78 O. L., 67; 78 O. L., 24.
It is true that statutes authorizing municipalities to build railways have been held unconstitutional (P., Ft. W. & C. Ry. Co. v. Martin, 53 Ohio St., 386), but for the reason only that this legislation offended against Section 1 of Article XIII of the Constitution, which provides that “The general assembly shall pass no special act conferring corporate powers.”
In the case of Walker v. City of Cincinnati, 21 Ohio St., 14, an act authorizing cities of' the first class having a population exceeding 150,000 inhabitants to construct a railway, ' issue bonds for such purpose and levy a tax to pay such bonds, was held to be constitutional. In that case, however, the question whether the act then under consideration was a special act conferring corporate powers, was not made by counsel and was not considered by the court. It might also be added that Section 26 of Article II of the Constitution was also overlooked. However, the particular thing to which I desire to call attention is the pertinent fact that it was not even suggested in these cases, much less decided by the court, that the authority attempted to be conferred by these statutes did not come within the scope of governmental purposes.
It is a matter of general knowledge that practically all of the cities of this state, and of our •sister states, maintain a public recreation department; parks are maintained and beautified for the pleasure and recreation of the people; music is provided for their entertainment; municipal lodging *120 houses, baths and bath houses are maintained, as well as other things of kindred nature, all tending not only to the betterment of immediate conditions, but also tending to the creation of higher ideals, and consequently a better citizenship. In this capital city of our state, immediately following the disastrous flood on the west side, the recreation department provided at public expense a moving-picture theater for the benefit of' the children of that unfortunate district until the schools could be reopened. Judge Dillon, in his work on municipal corporations, 5th ed., Section 21, calls attention' to the fact that municipalities in Great Britain, in addition to the enterprises in which our American cities are engaged, also own and operate ice manufactories, buildings for entertainment and music; engage in the sale and distribution of milk; engage in brick-making; maintain buildings and dwellings for laboring men, and other kindred commercial and altruistic enterprises.
It has been suggested that if the purposes of this moving-picture theater are educational, then any attempt of the municipal authorities to appropriate public money for such purpose is unconstitutional, for the reason that such matters come directly within the control of the board of education. I do not think this view is correct. While I do not believe any municipality has the -right to interfere with the established school system of this state, yet because a municipal project may be educational in effect is certainly no sound reason for holding that it does not come within the scope of the governmental *121 powers of a municipality. The cities of this state, and the state itself, engage in many projects that are educational in their nature aside from the public school system, which is clearly within the control of boards of education.
It is further contended that this ordinance is in violation of Section 19 of Article I of the Constitution, which provides, among other things, that private property shall ever be held inviolate, for the reason that if municipalities are permitted to engage in such enterprises, private property may be confiscated by taxation. Section 13 of Article XVIII of the' Constitution' provides that laws may be passed to limit the power of municipalities to levy taxes and incur debts for local purposes. This is full protection to the citizens and a complete answer to the suggestion. However, it may be said in passing, that if every beneficent purpose of government must be abandoned because taxes are to be levied upon some unwilling person, then we might as well prepare to abandon all plans of civic betterment, tear down our libraries and close our schools. It is said that it is of grave importance that public credit should be protected, particularly the credit of the municipal corporations of this state, and that the granting to municipalities the power to engage in such enterprises as this would impair that credit. This is a question largely for the municipality to determine, subject to the limitations of Section 13 of Article XVIII above referred to. Citizens should have enough interest in their own affairs to compel honest, efficient and economical administration of their local gov *122 ernment. But if it be granted that neither the vigilance of the people nor the provisions of Section 13 of Article XVIII are sufficient safeguards to protect municipal credit, then the further answer may be made that the people themselves make the constitution and the courts are but instruments also created by the people to give effect to that constitution, and that, therefore, it is not the province of a court to inquire as to the wisdom or the folly of any provision, either of the law or of the constitution, but rather to interpret and enforce the same according to the meaning and intent of the authority creating it. It is entirely possible that different minds honestly searching for the truth may arrive at different conclusions as to the construction of any written constitution or of any law. This is fairly demonstrated by the fact that the members of this court, who have been equally industrious, honest and intelligent in their efforts to arrive at the true meaning and purpose of this amendment to our constitution, having no purpose to serve except to arrive at the right, are, nevertheless, evenly divided as to one proposition, and but a bare majority concur in the other. The peace of the state demands that the controversy arising from such difference of opinion must be submitted to the arbitration of a court for final determination, and if perchance this court should err in its judgment, these constitutional amendments themselves provide a ready means for the correction of that error.
It is contended in the brief of counsel for relator that it is not the intention of the city to em *123 bark on a private money-making enterprise and that it is not about to engage as a competitor with enterprises operated exclusively for profit, but that, when such theater is established, it will be used in a strictly public sense, to promote the education and the patriotism of the citizens generally, and to advance the understanding and appreciation of the individual civic responsibilities of each citizen. If that is, the fact, then these purposes should have been declared in the ordinance as the purposes for which the appropriation was sought to be made, without reference to the methods or the instruments to be used in the accomplishment of these purposes, but, so. far as this ordinance reads, it may or may not be operated for any public purpose whatever. In fact, it does not appear from the ordinance itself that this moving-picture theater is to be established in the city of Toledo. If it is to be established without the city of Toledo, of course, that is the end of the controversy, for by no possibility could such an enterprise be held to come within the powers of local self-government. It is true the ordinance designates a “municipal moving-picture theater,” and it might be argued that the use of the word “municipal” is sufficient indication that the theater is to be used for municipal purposes. But such things are not so common in Ohio that the mere use of the word “municipal” sufficiently defines or qualifies the nature and the purposes of the theater to be established. This designation, perhaps, is sufficient to show that it is to be established and operated within the limits of that city, and I think it only fair so to *124 hold, but further than that no presumption obtains as to the purpose of this theater aside from these considerations; however, in the passage of this ordinance the municipal authorities entirely overlooked the general laws of the state now in force in reference to municipal corporations.
Section 2 of the act passed May 31, 1911 (102 O. L., S21), entitled, “An act to provide for the initiative and. referendum in municipal corporations,” provides, among- other things, that no ordinance involving the expenditure of money shall become effective in less than sixty days after its passage.
Section 3 of this act provides that any act not included within those specified in Section 2 may be declared to be an emergency measure, and may go into effect immediately. This ordinance is one involving the expenditure of money, and one that, by the provisions of ■ Section 2 of the act above referred to, shall not go into effect for sixty days after its passage. Therefore, the city council had no power or authority to declare this ordinance to be an emergency measure, to take effect immediately.
It is suggested that counsel have waived this defect. I do not understand either from briefs or oral arguments that any such waiver is intended or attempted. But whether it is attempted to be waived or not, it is sufficient to say that neither the auditor nor his counsel have any right or authority to waive the positive provisions of a statute designed for the protection of the taxpayer.
It is true this question is not of general importance, but the relator is asking for a peremptory writ of mandamus, and before such a writ *125 can be issued its right to such a writ must be clear. Having held that these general statutes, not inconsistent with the amendment, are the general statutes contemplated and comprehended in the provisions of Section 2 of Article XVIII, it follows that to be consistent they must be given application to this particular case, but, of course, not for the purpose of evading the real questions presented. .
For the reason, therefore, that this ordinance does not show on its face that this appropriation is for the public purposes mentioned in counsel for relator’s brief, or any other public purpose, and for the further reason that the city council has no authority to declare a resolution or ordinance involving the expenditure of money an emergency measure, and for no other reason, I concur in the judgment refusing the writ.